# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**EUNICE DARLENE FLOYD,**

          **Plaintiff,**

**-vs-**                                                              **Case No.  6:13-cv-655-Orl-28DAB**

**NORTHEAST FLORIDA HEALTH
SERVICES, INC.,**

          **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

    This cause came on for consideration without oral argument on the following motion[1] filed herein:

| | |
|---|---|
| **MOTION:** | **MOTION FOR SUMMARY JUDGMENT (Doc. No. 36)** |
| **FILED:** | **December 9, 2013** |
| | |
| **THEREON** it is **RECOMMENDED** that the motion be **GRANTED**. | |

    Plaintiff brings this employment discrimination action against Defendant Northeast Florida Health Services, Inc. ("NEFHS"), alleging race discrimination, harassment, and retaliatory termination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII").  Doc. 23.  Specifically, Plaintiff, who is white, alleges that she was terminated after being denied assistance with her work on the basis of her race.  NEFHS has moved for summary judgment, and as discussed below, it is respectfully **RECOMMENDED** that NEFHS' Motion be **GRANTED**.

---

[1]On May 16, 2014, Plaintiff filed a "Notice of Filing Status Update" stating that Cheri Boyd was no longer employed by Defendant.  Doc. 44.  Such information is irrelevant to the issues raised on summary judgment.

## I. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). However, when faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc*., 131 F.3d 995, 999 (11th Cir. 1997).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Southwest Airlines Co.*, 243 F.Supp.2d 1257, 1262 (D. Kan. 2003) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer*, 243 F.Supp.2d at 1263 (quoting *Anderson*, 477 U.S. at 251–52).

## II. Factual Background[2] and Procedural History

---

[2]The facts are adopted from Defendant's Statement of Undisputed Material Facts and are either undisputed by Plaintiff or read in the light most favorable to Plaintiff. *See* Doc. 39 at 4-14. Plaintiff submitted a "Preliminary Statement" listing eighteen factual statements but without any citation whatsoever to the record (Doc. 39 at 1-4), as well as two Declarations. Doc. 39-2 Only the *undisputed* facts or those read in the light most favorable to Plaintiff supported by her

(continued...)

Plaintiff, a white female, was employed by NEFHS from September 29, 2009 to November 19, 2010.  Doc. 39 ¶ 1.  NEFHS is a private not-for-profit corporation that operates as a federally recognized community health center in Volusia County.  Doc. 36 ¶ 1 (Defendant's Statement of Undisputed Material Facts).  NEFHS is run by its own board of directors; however, it receives funding from West Volusia Hospital Authority ("WVHA"), a provider of access to health care for low-income residents of the district[3].  Doc. 36 ¶ 1.  A board of five elected commissioners oversees the WVHA, but the WVHA has no authority over the employment decisions of NEFHS.  Doc. 36 ¶ 1.

On September 22, 2009, Plaintiff completed an application for employment at NEFHS[4].  Doc. 36 ¶ 2.  Plaintiff was interviewed by Ms. Boyd (white female), the Chief Operations Officer, who hired Plaintiff as a medical assistant for NEFHS and remained her supervisor until Plaintiff's termination.  Doc. 36-3 (Plaintiff Floyd Dep. ("P. Dep.") at 45, 63, 101, 145); Doc. 39-2 (Floyd Dec. #1) at 9 ¶ 4.  NEFHS has clinics in three locations: Pierson, Deland, and Deltona.  Plaintiff initially worked at the Pierson office as a medical assistant.  Doc. 36 ¶ 4, Doc. 39 ¶ 1.  Shortly after Plaintiff began working, a patient complained about Plaintiff and one of the doctors at NEFHS's Pierson clinic had issues with Plaintiff.  Doc. 36-3 (P. Dep. at 54, 64); Doc. 36-1 (Boyd Dec.) ¶¶ 7-9.  Although Ms. Boyd was aware of these complaints, they were not officially noted in Plaintiff's personnel file prior to July 2010.  Doc. 39-2 at 10 ¶ 5.  Following the complaints, in December 2009, Ms. Boyd offered Plaintiff, who accepted, a transfer to the DeLand location, where she was a medical assistant for ARNP Sylvia Triplett.   Doc. 39-2 at 9 ¶ 3; Doc. 36-1 ¶ 8.

---

[2](...continued)
Declarations based on her personal knowledge (as opposed to hearsay from others) or the sworn deposition testimony of others are utilized from Plaintiff's submissions.  As the Court previously ruled, the problematic submissions would not be stricken, but would be given the appropriate weight based on the evidentiary rules.  *See* Doc. 43.

[3]WVHA is an independent special taxing district of Volusia County.  Doc. 36 ¶ 1.

[4]In her application, Plaintiff disclosed that she was terminated from her prior employer for calling the State of Florida and making a patient care complaint. Doc. 36 ¶ 2. In the interview, Plaintiff discussed at length that she was terminated from prior employment after she called the State and made allegations of patient abuse. Doc. 36 ¶ 2.

Within approximately two months of working at the DeLand office, two other employees, Ms. Triplett and medical assistant Cindy Marquez, both Hispanic, complained to Ms. Boyd about Plaintiff's attitude; Ms. Boyd notified Plaintiff that Ms. Marquez and Ms. Triplett were having problems with her attitude.  Doc. 36-3 (P. Dep. at 87-88); Doc. 36-1 ¶ 9.  At the end of February or beginning of March 2010, because the DeLand office did not have a referral clerk (in that the medical assistants typically did their own referrals), instead of terminating Plaintiff, Ms. Boyd offered Plaintiff a position as a referral clerk for the DeLand office handling all of the referrals except Ms. Triplett's. Doc. 36-3 (P. Dep. at 80, 87-88, 90); Doc. 36-1 ¶ 9; Doc. 39-2 at 10 ¶ 6.  Ms. Triplett's referrals were to be completed by the medical assistant Cindi Marquez (Hispanic).  Doc. 39-2 at 10 ¶ 6; Doc. 36-3 (P. Dep. at 90).  A "referral" from a doctor or nurse practitioner apparently required the NEFHS employee to make an appointment for a patient with another medical provider, such as a specialist or hospital, and then contact the patient to let them know of the appointment time; patients were not allowed to make the referral appointments on their own.

In March or April 2010, Plaintiff was asked to cover for Ms. Ortiz's maternity leave, which lasted four to five weeks.  Doc. 39-2 at 10 ¶ 7.  Plaintiff only worked at the DeLand office and only handled the DeLand referrals, while Zenaida Rodriguez (Hispanic) was the referral clerk at the Deltona office[5].  Doc. 36-3 (P. Dep. at 88, 90, 98-99).  Plaintiff never worked at the Deltona office, and was told by Ms. Boyd that she was not to help Ms. Rodriguez with the Deltona referrals. Doc. 36-3 (P. Dep. at 99).

Plaintiff was periodically behind on her own referrals, and Ms. Boyd notified Plaintiff two to three times a month that she needed to get caught up with the referrals. Doc. 36-3 (P. Dep. at  98-99).  Ms. Boyd received complaints from multiple patients about Plaintiff and the DeLand referrals and she

---

[5]Brandi Whidden (White) was the referral coordinator at the Pierson office, but also handled other responsibilities. Doc. 36-3 (P. Dep. at 99).

warned Plaintiff on more than one occasion, "Darlene, I've had complaints on you with the referrals." Doc. 36-3 (P. Dep. at 148-49, 153); Doc. 39-2 at 47-52.

Plaintiff does not deny that at times her referrals would become backed up, despite her best efforts. Doc. 39-2 at 10 ¶ 8. In June 2010, Ms. Boyd held an office meeting and notified Plaintiff that she must get caught up on referrals. Doc. 36-3 (P. Dep. at 98). Ms. Boyd assisted Plaintiff with her referrals on several occasions, although Plaintiff disputes the number of occasions and whether Ms. Boyd actually brought Plaintiff fully "current." Doc. 36-3 (P. Dep. at 104-05). However, Plaintiff does not dispute that Ms. Boyd would do 15-20 referrals when she visited the DeLand Office. Doc. 39 at 6 (SOF) ¶ 9.

Ms. Boyd also authorized other coworkers to assist Plaintiff with the referrals. Doc. 39-2 ¶ 14. Ms. Boyd approved Elizabeth Torres, a medical assistant, coming in one Saturday to assist Plaintiff with her referrals. Doc. 36-3 (P. Dep. at 105, 107). However, according to Plaintiff, the assistance from Ms. Torres was limited and consisted of pulling the referral from the computer and placing it on top of the patients' charts, which only resulted in "further back up of the referrals" because the actual phone calls to the specialists or hospitals were not made by the person helping. Doc. 39 at 6 ¶ 10.

Assistant cardholder worker[6] Sully Carbajal also assisted Plaintiff with her referrals when she completed her own work for the day. Doc. 36-3 (P. Dep. 105, 108-09). The medical assistant for the ER Diversion program, Gloria Cisneros, assisted Plaintiff with her referrals. Plaintiff trained Ms. Cisneros how to do referrals, and Ms. Cisneros assisted with the referrals when she was not busy with patients. Doc. 36-3 (P. Dep. at 109). However, the training was after 5 p.m., when offices and hospitals were closed and the referrals could not be completed. Doc. 36-3 (P. Dep. at 113). Plaintiff alleges she was eventually replaced by Ms. Cisneros (Hispanic), who was then given assistance by

---

[6]The job involved taking WVHA applications. Doc. 36-3 (P. Dep. at 108).

Mr. Sanchez and others to get caught up when she took over the position.  Doc. 39-2 at 19 ¶ 58; Doc. 39-2 at 41 (Sanchez Dep. at 57).

DeLand employee Maria Ortiz also assisted Plaintiff with her referrals, but this ceased in October 2010 when Plaintiff moved to the ERD-Program.  Doc. 39 ¶13; Doc. 36-3 (P. Dep. at 108). While Plaintiff contends Ms. Ortiz was a supervisor or an "office manager," Plaintiff was informed by Chief Financial Officer Kelli Graham that Maria Ortiz was not the Office Manager; however, Plaintiff responded that Ms. Boyd told her, in her absence, Ms. Ortiz was the office supervisor.  Doc. 36-4 (P. Dep. at 27); Doc. 39-2 at 10 ¶ 4.

It is undisputed that several individuals made efforts to help or assist Plaintiff with her referrals: "[P]eople were good at trying to help me." Doc. 36-3 (P. Dep. at 113).  However, Plaintiff contends that they were unable to effectively complete the referrals for various reasons, such as the physicians' offices being closed after hours and on Saturdays. Doc. 39-2 at 26 ¶ 20; Doc. 36-3 (P. Dep. at 113).

By August 2010, Plaintiff was weeks behind on referrals and Ms. Boyd had received several complaints about Plaintiff's attitude and untimeliness. Doc. 36-3 (P. Dep. at 148-49, 153);  Docs. 36-6, 36-7, 36-8 (Dec. of T. Barnes, T. Knight, and K. Davis, NEFHS patients).  On August 17, 2010, Ms. Boyd emailed Plaintiff regarding a complaint she received from a doctor's office about Plaintiff: "I don't like getting phone calls from these offices [complaining of] not getting their referrals on time so we must shape up or else." Doc. 36-3 (P. Dep. at 158, 166-67, 197) Doc. 36-3 at 64 (Ex. 9); Doc. 36-1 ¶12-15.

In August 2010, Angel Sanchez was hired; Plaintiff believed he was hired to assist with referrals in the DeLand and Deltona Offices.  Doc. 39-2 at 10 ¶ 9.  By September 2010, Plaintiff had piles of referrals on her desk. Doc. 36-3 (P. Dep. at 174, 175).  Ms. Boyd asked Plaintiff, and Plaintiff agreed, to move to the ER Diversion Program in October 2010; consequently, her hours were changed

to 12:00 p.m. to 8:30 p.m.  Doc. 39-2 at 11 ¶ 12.  Plaintiff believed that "management would cover

the referrals" from 8:00 a.m. to 12:00 p.m. *Id*.  At the end of October 2010 the referrals were getting

backed up because Plaintiff had no way to make appointments or contact patients after 5:00 p.m. daily

when hospitals and physician's offices were closed (and she did not begin the workday until 12 noon);

thus, Plaintiff sought to obtain help with the backed-up referrals.  Doc. 39-2 at 11 ¶¶ 15-16.  Plaintiff

complained to Ms. Boyd that no one else was working on referrals during the day and asked Ms. Boyd

why Mr. Sanchez was not allowed to assist with the referrals; however, Ms. Boyd did not respond to

Plaintiff's complaints.  Doc. 39-2 at 11 ¶¶ 15.

By November 10, 2010, when Plaintiff was returned to working exclusively on the referrals,

she estimates they were "at least 3 to 4 weeks behind."  Doc. 39-2 at 11 ¶ 17.  Plaintiff became

concerned that she was going to be fired and, on November 12, 2010, Plaintiff emailed Ms. Boyd

notifying her that she was "drowning so bad in these referrals," she did "not want to get fired because

of these referrals," and she needed additional assistance.  Doc. 39-2 at 11 ¶18 & Ex. 18; Doc. 36-3

(P. Dep. 184-85); Doc. 36-3 at 65  (Ex. 14).

Sometime during the week of November 15, 2010, Ms. Boyd and Chief Executive Officer

Kathy Wilkes made the decision to terminate Plaintiff on Friday, November 19, 2010. Doc. 36-1 ¶

17.  On November 16, 2010, Plaintiff spoke to Ms. Boyd in the parking lot of the DeLand office,

asking Ms. Boyd if she was going to be fired because she could not get the referrals done in a timely

manner and Ms. Boyd told her, "that is why I sent you the email[7]."  Doc. 36-3 (P. Dep. at  196-97).

Ms. Boyd again told Plaintiff that other people were assisting Plaintiff with her referrals and it was

Plaintiff's responsibility to get the referrals completed in a timely manner. Doc. 36-3 (P. Dep. at

196-97).  Plaintiff again asked for assistance and Ms. Boyd told her that Mr. Sanchez was hired to

---

[7]Ms. Boyd also told Plaintiff that "Zee" (Rodriguez), the referral clerk in Deltona, was also sent the email because she was getting "way too many complaints," however, when Plaintiff looked at the email she did not see that "Zee" was sent the same email on November 16, 2010.  Doc. 39-2 at 13 ¶ 23.

assist her and he was assisting her; however, Plaintiff told Ms. Boyd that Mr. Sanchez was not helping her.  Doc. 39-2 at 12 ¶ 22; Doc. 36-3 (P. Dep. at 197).

Ms. Boyd's November 16, 2010 email informed Plaintiff:

> I understand that you are overworked, but so is everyone else.  I am getting a lot of complaints about the referrals at the DeLand center.  I do not mean to sound so ugly, but we have to do something or else we have to make some changes.  You should be able to do at least fifty referrals a day.  I need for you to let me know at the end of the day the number of referrals that you have completed in that day. . . .I had 110 calls yesterday on my phone, these were from the last two days and 90% were complaints about your referrals.  I also had two complaints about you being rude with two different patients.  What gives??? . . . I can't continue to cover for you, nor can I afford to lose my job for you.  When I get complaints, my boss gets complaints also and personally I don't like getting my behind chewed.  So I'm asking in a nice way; please do your job and get those referrals off your desk. . . Lisa Bennis is NOT your boss; I am and this is the way NEFHS will operate or else.

Doc. 36-3 (P. Dep. at 208-09); Doc. 36-3 at 102 (Ex. 14).  Plaintiff considered the email from Ms. Boyd to be "harassment."  Doc. 36-3 (P. Dep. at 208-09).  Plaintiff subsequently forwarded the email chain to the Chief Financial Officer Kelli Graham asking, "Is this for real?"  Doc. 39-2 at 13 ¶ 25.  Plaintiff called and spoke with Ms. Graham and asked to meet with her; she agreed to see Plaintiff on November 18, 2010.  Doc. 39-2 at 13 ¶ 27.

Prior to November 16, 2010, Plaintiff's co-worker, Sully Carbajal had been permitted to assist Plaintiff "typically every day" with the referrals because Plaintiff was "really backed up."  Doc. 36-9 (Carbajal Dep. at 78, 81 & Ex. 10); Doc. 39-2 at 37 (Ex. 11, 12 (Carbajal Dep. at 64, 68)).  On the same day that Plaintiff received the email from Ms. Boyd, Ms. Carbajal was assisting Plaintiff with referrals, but she was instructed to stop, according to instructions from Ms. Boyd.  Doc. 39-2 at 12 ¶ 19.  Late in the work day (at 4:23 p.m.) on November 16, Ms. Carbajal sent an email to Ms. Boyd challenging these instructions. In the email, Ms. Carbajal states:

> I know you know that Darlene is backed up on referrals. I am wanting to help her catch up on some when I have spare time.  We were told we could help and that we should all do everyone's jobs and help out when needed.  Well in my opinion Darlene needs help and I am willing to help her because if I am wrong what does our name of the company [NEFHS d/b/a] "Family" Health Source mean to me - united - and how

are we supposed to work when we are all told we cannot help one another. Like I can't help Lisa prepare for the next day which I still do once I am done with my job.  It's hard here in DeLand and I know that you all know I have worked in all three centers and honestly I believe DeLand has the most  [patients.]  I was told today that I could not help [Plaintiff] do referrals. I have been helping her and I was told by Ms. Cheri [Boyd] that I could once I catched (sic) up on my work…later my office manager tells me that I cannot help [Plaintiff] nor Lisa… And at this point Darlene has no help at all by no one.  I do apologize if my understanding of team work is different than what it is to you, but I think and strongly believe my co-workers needs help and I am once again willing to help.

Doc. 36-9 Ex. 10 (Carbajal email); Doc. 39-3, Ex. 48 (same).[8]

On November 17, 2010, Ms. Carbajal emailed Plaintiff apologizing that she was not allowed to help Plaintiff with the referrals per Ms. Boyd.  Doc. 39-2 at 12 ¶ 19, Ex. 19 (email).  Plaintiff frequently asked for assistance on the referrals from Ms. Ortiz, but Ms. Ortiz would say Mr. Sanchez could not assist Plaintiff. Doc. 39-2 at 12 ¶ 21.  As of November 16, Ms. Boyd told Plaintiff she believed she was receiving help on the referrals, especially from co-worker Angel Sanchez.  Doc. 36-3 (P. Dep. at 197-98).  However, Mr. Sanchez never helped Plaintiff on the referrals.  Doc. 39-2 at 79 (Sanchez Dep. at 88).  Every time he offered to help, the office manager (Ms. Ortiz) told Mr. Sanchez he could not help Plaintiff.  Doc. 39-2 at 81 (Sanchez Aff.).

On November 17, 2010, Plaintiff learned from Ms. Carbajal that Ms. Boyd was coming to the DeLand office to talk about Ms. Carbajal's November 16, 2010 email; however, Ms. Boyd never arrived that day.  Doc. 39-2 at 13 ¶ 28.  Plaintiff confided in her co-workers that she felt she was going to be terminated and that Ms. Boyd was not talking to her anymore; Plaintiff began removing some of  her personal belongings from work.  Doc. 36-3 (P. Dep. at 230, 233, 234-37); Doc. 39 ¶ 22 (SOF).

---

[8]Plaintiff argues Ms. Carbajal emailed a complaint to all administrators alleging "discriminatory misconduct" against Plaintiff and another employee, Lisa; however, other than the November 16, 2010 email quoted above, there is no such email in the evidence or citations supplied by Plaintiff which complains of "discriminatory conduct." Doc. 39. Ms. Carabajal did state at her deposition that she believed not allowing Plaintiff help with the referrals was "not fair" but – in the portion of the transcript provided by Plaintiff– Ms. Carabajal does not allege the treatment was discriminatory or based on Plaintiff's race.  Doc. 39 ¶ 23 & Doc. 39-3 Ex. 48, 53 (Carabajal Dep. at 120-125).

On Thursday, November 18, 2010, Ms. Graham, the Chief Financial Officer, came to the DeLand office to drop off paychecks and, although she said she was in a hurry, Plaintiff asked whether "[S]he was indeed the HR person that we would go to if we had a complaint about being bullied, harassed and threatened?"  Doc. 39-2 at 14 ¶ 31.  When Ms. Graham replied in the affirmative, and asked to whom Plaintiff was referring, she said it was Ms. Boyd; Ms Graham then "laughed in her face" and asked, "How?" Doc. 39-2 at 14 ¶ 31.  Plaintiff stated "Didn't you see the emails I sent you? I don't want to be fired over the referrals."  Doc. 39-2 at 14 ¶ 31. Ms. Graham replied "You're not going to get fired, she's just mad because of all the complaints she's getting about the referrals, just get the referrals caught up." Doc. 39-2 at 14 ¶ 31.  Plaintiff responded that she was "doing the referrals as quick as I can"; when Ms. Graham stated that Mr. Sanchez was helping her, Plaintiff told her that "No, Angel is not helping me do the referrals, he is supposed to, but Ms. Ortiz will not allow him or anyone else to assist me."  Doc. 39-2 at 14 ¶ 32.  Ms. Graham then stated that Ms. Ortiz was not the office supervisor, and Plaintiff responded that "per Ms. Boyd, she is our supervisor." Doc. 39-2 at 15 ¶ 33.  Ms. Graham then stated, "Just get caught up on your referrals as quick as you can" and "she would look into it." Doc. 39-2 at 15 ¶ 33.

Also on November 18, 2010, the WVHA held a meeting and a patient complained about the referrals at the NEFHS DeLand clinic. Doc. 36-3 (P. Dep. at 250).  The same day, Ms. Boyd came to the DeLand office, and met with Ms. Carbajal; after the meeting Ms. Carbajal appeared upset.  Doc. 39-2 at 13-14 ¶¶ 29-31.

On Friday, November 19, 2010, Ms. Boyd contacted Ms. Graham and asked her to serve as a witness in the termination meeting with Plaintiff. Doc. 36-1 (Boyd Dec. ¶18).  That same morning, on November 19, 2010, at 10:28 a.m., Plaintiff left a message with the receptionist at the accounting firm that provides administrative support for the WVHA.  Doc. 36-3 (P. Dep. 241-42); Doc. 39-2 at 15 ¶ 36, Ex. 45. The message was to the effect: "I need to get ahold of Ms. Lindquist or [Juanita]

McNeil," two of the board members of WVHA, about "patient care issues"; Plaintiff asked the receptionist and was assured that the message would be kept confidential. Doc. 36-3 (P. Dep. 302, 241-42); Doc. 39-2 at 15 ¶ 36, Ex. 45. Ms. McNeil returned Plaintiff's call about an hour later, assuring her the call would be confidential. Doc. 36-3 (P. Dep. 243); Doc. 39-2 at 16 ¶ 37. Plaintiff told Ms. McNeil about the issues at the DeLand center, about the referrals situation, and about how she was being allegedly mistreated by management; Plaintiff suggested Ms. McNeil stop by the DeLand office to witness how it was run. Doc. 36-3 (P. Dep. 243); Doc. 39-2 at 16 ¶ 38. Plaintiff also told Ms. McNeil that she "was pretty sure she was going to be fired because of the way the referrals had backed up." Doc. 36-3 (P. Dep. at 248-49, 251). When Plaintiff explained that she was worried she would be fired if management found out about her call to the WVHA, Ms. McNeil stated that she would not be fired for calling the WVHA. Doc. 36-3 (P. Dep. 243); Doc. 39-2 at 16 ¶ 40.

Shortly after Plaintiff's call to Ms. McNeil, she visited the DeLand office about 12:45 p.m., asked about the availability of applications in Spanish (which apparently were not available), and Ms. McNeil left the office; less than two hours after McNeil's visit, Plaintiff was terminated. Doc. 39-2 at 16 ¶¶ 42-45. The substance of the conversation between Plaintiff and Ms. McNeil was never revealed to anyone at NEFHS prior to Plaintiff's termination. Doc. 36-3 (P. Dep. at 282); Doc. 36-2 (Tr. of Admin. Hrg.- McNeil testimony at 36-37). However, when Ms. Boyd and Ms. Graham arrived at the DeLand office at approximately 3:30 p.m. on November 19 to terminate Plaintiff, she realized that management had been told she had made a call to the WVHA and that Ms. McNeil had visited to the DeLand office approximately two hours earlier. Doc. 39-2 ¶ 47; Doc. 36-3 (P. Dep. at 259); Doc. 36-1 ¶ 19.

Upon their arrival at the DeLand office, Ms. Boyd and Ms. Graham convened privately in a room, and while they were together working on a computer, Plaintiff knocked and entered the room. Doc. 36-3 (P. Dep. at 259). Plaintiff asked Ms. Boyd and Ms. Graham if they were there to see her;

they responded yes, but continued looking at or working on the computer.  Doc. 36-3 (P. Dep. at 259).  While remaining in the office with them, Plaintiff called Ms. McNeil in front of them and left a message stating:  "This is Darlene, you asked me to call and tell you if anything was happening. I'm letting you know that I am getting ready to be terminated. I'm in the office with" and Plaintiff read Ms. Boyd's name badge; however, at that time, Plaintiff had not yet been told that she was being terminated. Doc. 36-3 (P. Dep. at 259-62).

After Plaintiff ended her call leaving a message for Ms. McNeil, Ms. Boyd explained to Plaintiff that she was being terminated because she had been behind on referrals and that Ms. Boyd had received several complaints from patients that Plaintiff was rude to them. Doc. 36-3 (P. Dep. at 263).  Ms. Boyd handed Plaintiff a copy of a "Separation Notice" stating she was being terminated for not doing her job in a timely manner, being rude with patients, being rude with other employees, and insubordination (calling the WVHA) instead of talking with appropriate supervisors.  Doc. 36-3 (P. Dep. at 263-64, 266); Doc. 36-1 ¶ 20-23; Doc. 39-3 at 18 (Ex. 46 - termination notice).  Ms. Boyd told Plaintiff that she was also being fired for calling the WVHA, who had called Ms. Boyd to tell her that Plaintiff had called them.  Doc. 36-3 (P. Dep. at 265).  Plaintiff refused to sign the termination notice;  Ms. Boyd and Ms. Graham signed it, noting Plaintiff's refusal to sign it, and dated it November 19, 2010. Doc. 39-2 at 18, ¶ 54.  Plaintiff was subsequently given a copy of the (unsigned) termination notice a few minutes later. Doc. 36-3 (P. Dep. at 265); Doc. 39-2 at 19, ¶ 55.  Plaintiff alleges she was eventually replaced by Ms. Cisneros, who is Hispanic.  Doc. 39-2 at 19 ¶ 58; Doc. 39-2 at 41.

### III.  Procedural History

On September 23, 2011, Petitioner filed[9] a Charge of Discrimination with the Florida

Commission on Human Relations (FCHR Charge No.: 201102282). Doc. 36-10; Doc. 39, Ex. 32.  In

her Charge of Discrimination, Petitioner alleged:

> I am a white female and I believe that I have been harassed, retaliated and treated
> differently than other non-white co-workers. . . . I feel that I was retaliated against for
> filing a verbal complaint on November 19, 2010 with the WVHA board member.
>
> I was retaliated against because I notified a board member of the WVHA about patient
> care issues, for example; patients were not receiving timely and adequate medical
> attention.
>
> ***
>
> The day I was terminated the respondent stated that the reason was because I was
> behind on referrals, but I believe this was a pretext because the Deltona office referral
> clerk was 2-3 months behind as well.  The only difference between here and [me] is
> that she is Hispanic and I am White.  It has come to my attention that the employee
> from the other office of a different race receives assistance with her work and I was
> not allowed to get the same opportunity.
>
> I believe that I have been discriminated against due to my race (White), retaliated and
> harassed due to reports made on 11/19/2010.

Doc. 36-10.

On March 13, 2012, the Florida Commission on Human Relations ("FCHR") issued a

determination of No Cause, pursuant to the Florida Civil Rights Act.  Doc. 36-11 (FCHR-No Cause

Determination).  Plaintiff filed a Petition for Relief, which was heard by the Florida Division of

Administrative Hearings Administrative Law Judge Gary Early who held a final hearing on

September 12-13, 2012. Doc. 36-12 (ALJ Early's Recommended Order).  During the course of the

hearing, Plaintiff stated, "I believe 100 percent of the reason I was fired is because of me calling the

---

[9]Plaintiff argues she originally contacted the FCHR on August 11, 2011, however, the date her operative
Complaint of Discrimination  was officially filed with the FCHR is September 23, 2011.  *See* Doc. 39-2 at 92.

WVHA," and she was not aware of any other NEFHS employee who contacted the WVHA and who had not been fired.  Doc. 36-2 (Tr. at 22-23, 41-42).[10]

ALJ Early issued a recommended order dismissing Plaintiff's claims and on December 19, 2012, the FCHR issued a Final Order dismissing Plaintiff's claims.  Doc. 36-13 (Final Order Dismissing Petition for Relief from An Unlawful Employment Practice).  On January 22, 2013, Plaintiff received a Right-to-Sue Notice from the EEOC, enabling her to pursue Title VII claims in the district court. Doc. 36-5 (P. Dep.(3) at  14, 18, 19 & Ex. 2).

On April 23, 2013, Plaintiff filed a Complaint against NEFHS, alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), specifically retaliatory termination based on national origin.  Doc. 1.  On July 11, 2013, Plaintiff filed an Amended Complaint, alleging (1) race discrimination, (2) harassment by members of management, and (3) retaliatory termination.  Doc. 23.

On December 9, 2013, NEFHS filed a Motion for Summary Judgment.  Doc. 36. On January 17, 2014, Plaintiff filed her Response to Defendant's Motion for Summary Judgment[11] (Doc. 39), and NEFHS filed their Reply on January 30, 2014.  Doc. 41.  The matter is now ripe for decision.

## IV. Discussion

As an initial matter, NEFHS asserts that Plaintiff's claims are barred in their entirety because Plaintiff failed to timely file her claims within 90 days of receiving her EEOC Right-To-Sue Notice. NEFHS also asserts that Plaintiff has failed to make out a prima facie case for her claims for race discrimination, harassment, and retaliation, and that NEFHS has offered a legitimate,

---

[10]Plaintiff disputes whether the administrative judge should have dismissed the case without giving her the right to present all of the evidence she wished to present. Doc. 39 ¶ 41.  This Court is not bound by the ALJ's ruling; however, Plaintiff's statements in the hearing are binding.

[11]Plaintiff did not file a motion for summary judgment but mentions in passing that "judgment should be entered for the Plaintiff as a matter of law based on the facts." Doc. 39 at 4.  Because Plaintiff did not file her own motion for summary judgment, the Court does not address whether she is entitled to summary judgment.

non-discriminatory reason for its actions which is not pretextual.  Plaintiff contends her lawsuit was not untimely filed, and she was discriminated and retaliated against on the basis of her race.

**A. Timeliness of Filing Suit**

NEFHS asserts that Plaintiff's claims contained within her EEOC charge were not timely filed in this Court within the 90-days statutory window.  Plaintiff argues that she is entitled to three extra days for mailing and her claim should be considered timely filed.

"No action alleging a violation of Title VII may be brought unless the alleged discrimination has been made the subject of a timely-filed EEOC charge." *Alexander v. Fulton Cnty., Ga.*, 207 F.3d 1303, 1332 (11th Cir. 2000), *overruled on other grounds by Manders v. Lee*, 388 F.3d 1304 (11th Cir. 2003). "Before a potential plaintiff may sue for discrimination under Title VII, [ ]he must first exhaust [his] administrative remedies. The first step down this path is filing a timely charge of discrimination with the EEOC." *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001) (citations omitted)[12].  Title VII provides that, "[i]f a charge filed with the Commission . . . is dismissed by the Commission . . . the Commission . . . shall so notify the person aggrieved and *within ninety days* after the giving of such notice a civil action may be brought against the respondent named in the charge." 42 U.S.C. § 2000e-5(f)(1) (emphasis added).

Under Title VII, a plaintiff must bring suit within 90 days of receiving a right-to-sue letter from the EEOC.  42 U.S.C. § 2000e–5(f)(1).  Dismissal is appropriate when the plaintiff fails to file her lawsuit within 90 days of receiving a right-to-sue letter, unless she shows that the delay was through no fault of her own. *Zillyette v. Capital One Fin. Corp.*, 179 F.3d 1337, 1339–41 (11th Cir.1999).  Once the defendant contests the issue, the plaintiff bears the burden of establishing that

---

[12]In a deferral state such as Florida, a plaintiff must file a charge "within three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e)(1).

she filed her claim within 90 days of receiving the notice. *Green v. Union Foundry Co.*, 281 F.3d 1229, 1234 (11th Cir. 2002) (finding that the defendant was entitled to dismissal because plaintiff had not filed his Title VII suit within 90 days of his receipt of the EEOC's notice of right to sue).

Plaintiff's received her Right-To-Sue Notice from the EEOC on January 22, 2013.  Doc. 36-5 (P. Dep.(3) at 14, 18, 19 & Ex. 2) (Charge of Discrimination), and  Plaintiff concedes that her lawsuit was filed on April 23, 2013 (Doc. 1), or 91 days after she received the Right-To-Sue Notice.  Doc. 39 at 14 ¶ 45[13].  Plaintiff argues, however, that her claims are not time-barred because she is entitled to three extra days for mailing under Federal Rule of Civil Procedure 6(d)[14], based on her interpretation of  *Tiberio v. Allergy Asthma Immunology of Rochester*, 664 F.3d 35 (2d Cir.  2011). Federal Rule of Civil Procedure 6(d) provides, "when a party may or must act within a specified time after service and service is made under Rule 5(b)(2)(C), (D), (E), or (F), 3 days are added after the period would otherwise expire under Rule 6(a)."  Fed. R. Civ. P. 6(d).

NEFHS argues in Reply (Doc. 41) that, in the context of the 90 day time period to commence a Title VII lawsuit, the period commences upon Plaintiff's *receipt* of the Right-To-Sue Notice, not upon the mailing of the Right-To-Sue Notice, thus, there is no reason to apply Rule 6 and allow three additional days for mailing in Plaintiff's case.[15]  NEFHS cites *Norris v. Florida Dep't of Health & Rehabilitative Services*, 730 F.2d 682 (11th Cir. 1984, which found the three extra days for mailing did not apply.

---

[13]In her Response, Plaintiff does not dispute NEFHS' Statement of Fact ¶ 45 which stated: "Ninety-one days after Plaintiff's receipt of her Right-To-Sue Notice, Plaintiff filed her Complaint against NEFHS on April 23, 2013" in Doc. 36 ¶ 45. *See* Doc. 39 at 14 ¶ 45.

[14]Plaintiff also cites a Florida Rule of Civil Procedure (Doc. 39 at 16), which is not applicable in federal court and does not warrant discussion.

[15]The Court notes that the time period for filing a lawsuit is specified in a federal statute and not elsewhere in the federal rules, making it even more unlikely that Rule 6(d) would even apply to extend the 90 day period.

In *Norris v. Florida Department of Health & Rehabilitative Services*, 730 F.2d 682 (11th Cir. 1984), the Eleventh Circuit held that, since the ninety-day time period for filing an employment discrimination complaint commences upon receipt and not upon mailing of the right-to-sue notice, the rule which provides for additional time after service by mail did not apply, which resulted in the plaintiff's complaint being held to be untimely. *Id*. at 683; *see Metz v. Home Depot, U.S.A., Inc.*, No. 8:06-cv-394-T-TGW, 2007 WL 3231795, *5 (M.D. Fla. Oct. 30, 2007) (ninety-day limitations period commenced when the plaintiff received notice of the right to sue at mailing address); *Blocker v. AT&T Technology Systems*, 666 F. Supp. 209, 213 (M.D. Fla. 1987) (holding Title VII race discrimination claims filed ninety-four days after receipt of right-to-sue letter were untimely); *cf. Kerr v. McDonald's Corp.*, 427 F.3d 947, 952 (11th Cir. 2005)(ADEA claims filed more than ninety days after limitations period began to run were untimely).

In this case, Plaintiff does not dispute she received the Right-To-Sue Notice on January 22, 2013, seven days after the Right-To-Sue Notice was mailed (and including the Martin Luther King holiday). Plaintiff also does not dispute that she filed her lawsuit on April 23, 2013, 91 days after she received the Right-To-Sue Notice. Pursuant to Eleventh Circuit precedent, the 90 days commences on the date Plaintiff received the Right-To-Sue Notice. *See Norris*, 730 F.2d 683. Plaintiff has not asserted a basis, nor does the Court find such a basis upon review of the evidence submitted, for equitable tolling to apply in this case.

The *Tiberio* decision relied on by Plaintiff does not stand for the proposition she asserts, but, rather, supports the position of NEFHS. The court in *Tiberio* held that the limitations period began to run on the date the right-to-sue letter from the EEOC was first *received* by plaintiff (or counsel, whichever was earlier), and since the plaintiff failed to identify the date she received the right-to-sue notice, the court *presumed* she received it three days after it was mailed by the EEOC. *Id.* at 38.

Here, it is undisputed through Plaintiff's testimony that she received her Right-To-Sue notice on January 22, 2013 – the Court need not presume the receipt date by including three days for mailing because the actual delivery date is undisputed. Because Plaintiff's lawsuit was filed 91 days after she received her Right-To-Sue Notice, her claims are time-barred.[16]

Accordingly, it is respectfully **RECOMMENDED** that NEFHS's Motion for Summary Judgment be **GRANTED** on the basis that Plaintiff's claims were untimely filed.

Assuming for the purposes of this analysis that Plaintiff's claims were not untimely filed, the Court will also address NEFHS's Motion for Summary Judgment as to the substance of Plaintiff's claims.

### B. Claims of Race Discrimination

Plaintiff alleges she was discriminated against by being denied assistance on completing referrals and by being "harassed" by management on the basis of her race in violation of Title VII. She also alleges that she was retaliated against in that she was terminated shortly after she complained to a WVHA board member about being denied assistance with the referrals.

#### 1. Disparate Treatment

*a. Analysis of comparator evidence.* Title VII provides in part that an employer may not discriminate against an employee because of that employee's race. 42 U.S.C. § 2000e–2(a)(1). "On any Title VII claim the plaintiff bears 'the ultimate burden of proving discriminatory treatment by a preponderance of the evidence.'" *Crawford v. Carroll*, 529 F.3d 961, 975 (11th Cir. 2008) (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)). Because Plaintiff has not presented any direct evidence of discrimination, the Court evaluates her claim using the

---

[16]Notably, if the three-day rule were applied to the date of mailing, the Complaint would be even farther out of time.

burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny to determine if Plaintiff can establish her claim through circumstantial evidence. *See, e.g., EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000) ("Disparate treatment claims require proof of discriminatory intent either through direct or circumstantial evidence. . . . Absent direct evidence, a plaintiff may prove intentional discrimination through the familiar *McDonnell Douglas* paradigm for circumstantial evidence claims.").

Under this three-part framework, the plaintiff in a disparate treatment case has the initial burden to establish a prima facie case of discrimination by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. at 802. "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). If the plaintiff establishes a prima facie case, a presumption of discrimination arises. *See, e.g., Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Case law has produced many different articulations of the elements of a Title VII plaintiff's prima facie case. The elements are to be flexibly rather than rigidly applied, and the formulations of these elements depend on the type of case and the pertinent facts. *See, e.g., Carter v. City of Miami*, 870 F.2d 578, 582 & 583 nn.12 & 14 (11th Cir. 1989) (noting variation in prima facie elements and that "[t]he Supreme Court has stressed that the *McDonnell* test was not intended to be a rigid or ritualistic test of disparate treatment"). Generally, "[t]o make out a prima facie case of racial discrimination a plaintiff must show (1) she belongs to a protected class; (2) she was qualified to do the job; (3) she was subjected to adverse employment action; and (4) her employer treated similarly situated employees outside her class more favorably." *Crawford*, 529 F.3d at 970.

If the plaintiff presents a prima facie case and its attendant presumption attaches, the burden "[s]hifts to the employer to articulate some legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas*, 411 U.S. at 802. The employer's "burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves*, 530 U.S. at 142 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). "If the defendant articulates one or more such reasons, the presumption of discrimination is eliminated and 'the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Chapman*, 229 F.3d at 1024 (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)).

In determining whether employees are similarly situated in cases involving allegedly discriminatory discipline, the court must evaluate "whether the employees [were] involved in or accused of the same or similar conduct and [were] disciplined in different ways." *Burke–Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006). The quantity and quality of the comparator's misconduct must be "nearly identical" to the plaintiff's misconduct, in order "to prevent courts from second-guessing employers' reasonable decisions." *Id.* (quotation marks omitted). Also, proffered comparators' actions are only relevant if it is shown that the decision maker knew of the prior similar acts and did not discipline the rule violators. *See Jones v. Gerwens*, 874 F.2d 1534, 1542 (11th Cir. 1989). Knowledge of a prior act cannot be imputed to a decision maker, because "[d]iscrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent." *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1262 (11th Cir. 2001).

Plaintiff alleges that she was discriminated against by being denied assistance with the referrals based on her race. NEFHS, on the other hand, asserts that Plaintiff has not established a

-20-

prima facie case for race discrimination regarding the denial of assistance because (1) Plaintiff cannot show that NEFHS treated any similarly situated employee outside of her protected class more favorably; (2) Plaintiff did, in fact, receive assistance with the referrals; (3) Ms. Boyd, who both hired and fired Plaintiff in a short period of time, did not use Plaintiff's race as a factor in either decision; (4) Plaintiff has previously stated her belief that she was terminated was because she called the WVHA, not because of her race. The arguments of NEFHS are well-taken.

Plaintiff, a white female, asserts that she was subjected to discrimination based on her race by the Chief Operating Officer, Ms. Boyd, and the DeLand office manager/supervisor, Ms. Ortiz, who denied her assistance with the referrals, leading to her eventual termination, even though the Hispanic referral clerk at another office, Zeniada Rodriguez, was given assistance with her referrals and was not terminated for being behind on her referrals.  Doc. 39 at 16.  Plaintiff's evidence that Ms. Rodriguez was behind on her referrals is based on the deposition testimony of Mr. Sanchez, who testified that Ms. Rodriguez was behind and he was allowed to assist her in catching up.

Plaintiff's "Separation Notice" stated that she was being terminated for not doing her job in a timely manner, being rude with patients, being rude with other employees, and insubordination (calling the WVHA) instead of talking with appropriate supervisors.  NEFHS argues that Plaintiff cannot state a prima facie case because she cannot establish that a similarly situated employee outside of her protected class was treated more favorably, primarily because Plaintiff unequivocally stated (in the DOAH hearing on her FCHR claim) that she was terminated for "calling the WVHA" and Plaintiff concedes that no other NEFHS employee contacted the WVHA and was not terminated. Thus, she has no comparator who was not terminated for "insubordination," *i.e.*, calling the WVHA instead of talking to supervisors.  NEFHS also argues that, while Plaintiff claims Ms. Rodriguez behind on referrals, Ms. Boyd, as the decision-maker, never received any complaints about Ms.

Rodriguez being rude to patients or co-workers. Thus, NEFHS argues, Ms. Rodriguez is not a proper comparator as her alleged misconduct was not "nearly identical" to Plaintiff's misconduct.

NEFHS contends that Plaintiff has not produced any evidence to rebut Ms. Boyd's sworn testimony: "Unlike Plaintiff, I did not receive patient complaints about the Deltona referral clerk, Zenaida Rodriguez . . . . In fact, I am not aware of any patient complaints about Ms. Rodriguez." Doc. 36-1 ¶24. Thus, because the decision maker Ms. Boyd did not know about any alleged patient complaints about Ms. Rodriguez, NEFHS argues, the alleged disparate treatment cannot be evidence of discrimination. Doc. 41 at 2 (citing *Summers v. City of Dothan*, 444 Fed. Appx. 346, 350 (11th Cir. 2011)[17] and *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1262 (11th Cir. 2001)).

In examining claims that employees were treated in a disparate manner, the Eleventh Circuit has explained that "it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Maynard v. Bd. of Regents of the Div. of Univs. of the Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003) (citation and internal marks omitted); *Silvera*, 244 F.3d at 1259 (same); *see also Santillana v. Fla. State Court Sys.*, 450 F. App'x 840, 843 (per curiam) (11th Cir. 2012) (unpublished) (citation omitted). "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) (citation and internal marks omitted); *Silvera*, 244 F.3d at 1259 (same).

"The employees outside of a plaintiff's protected class who are identified as comparators must be similarly situated in all relevant respects." *Phillips v. Aaron Rents, Inc.*, 262 F. App'x 202, 208 (11th Cir. 2008) (per curiam) (unpublished) (citation and internal marks omitted); *see also Lee v. U.S.*

---

[17]Unpublished opinion of the Eleventh Circuit constitute persuasive, and not binding, authority. *See* 11th Cir. R. 36-2 and I.O.P. 6.

*Steel Corp.*, 450 F. App'x 834, 839 (11th Cir. 2012) (per curiam). "[F]actors which may be used to determine whether two employees are directly comparable [include]: (1) whether they held the same job description, (2) whether they were subject to same standards, (3) whether they were subordinate to the same supervisor and (4) whether they had comparable experience, education, and other qualifications." *Johnson v. Gwinnett Cnty. Sch. Dist.*, No. 1:11–CV–00471–TWT–RGV, 2012 WL 5987584, at *11 (N.D. Ga. Oct.17, 2012), *adopted by* 2012 WL 5987581, at *1 (N.D. Ga. Nov.28, 2012) (alterations in original) (citations and internal marks omitted).

The Eleventh Circuit requires "that the quantity and quality of the comparator's misconduct be nearly identical [to the plaintiff's] to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia*, 171 F.3d at 1368–69 (citing *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 19 (1st Cir. 1989), *overruled on other grounds, Educadores Puertorriqueños en Acción v. Hernandez*, 367 F.3d 61 (1st Cir. 2004) ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.")); *see also Vega v. Invsco Grp., Ltd.*, 432 F. App'x 867, 870 (11th Cir. 2011) (per curiam); *Morris v. Duncan*, Civil Action File No. 1:08–CV–3566–JFK, 2011 WL 1397431, at *19 (N.D. Ga. Apr. 12, 2011) (citation omitted). "[I]f a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present."); *Rioux v. City of Atlanta*, 520 F.3d 1269, 1277 (11th Cir. 2008) (quoting *Holifield*, 115 F.3d at 1562). Furthermore, "proffered comparators' actions are only relevant if the plaintiff shows that the decisionmaker knew of the prior similar acts and did not discipline the rule violators." *Lee*, 450 F. App'x at 839 (citation omitted).

Reading the facts in the light most favorable to Plaintiff, even if both Plaintiff and Ms. Rodriguez were behind on their referrals, they were not comparators from the decisionmaker's

standpoint.  According to the decisionmaker Ms. Boyd, she had received multiple complaints from patients and coworkers/medical staff about Plaintiff, but had received no complaints from patients about Ms. Rodriguez[18]; Plaintiff has also conceded that she was aware that patients had complained about her.  Thus, Ms. Rodriguez was not an appropriate comparator.  Moreover, Plaintiff does not dispute that no other employee had contacted the WVHA and had not been terminated.  Thus, Plaintiff has failed to allege a proper comparator in this case – that is, a "similarly situated," non-white employee who received more favorable treatment or was not reprimanded/terminated for the same conduct that led to Plaintiff's termination.  *See Summers,* 444 Fed. Appx. at 349 (other officer's conduct was not nearly as severe as plaintiff's and he was therefore not a comparator).

NEFHS contends Plaintiff's assertion that Ms. Boyd failed to investigate her claim of lack of assistance has no merit because, as an employer, NEFHS was not required to provide Plaintiff with assistance to do her job.  In addition, NEFHS argues, to the extent Plaintiff claims that she was denied assistance because of her race, her assertions are contradicted by her admission that she did receive assistance from Cheri Boyd, Sully Carbajal, Elizabeth Torres, Gloria Cisneros, and Maria Ortiz, and that Ms. Boyd specifically authorized co-workers to assist Plaintiff with her work.  Plaintiff does not dispute that several individuals assisted her with the referrals for months or that Ms. Carbajal (as she testified) helped Plaintiff "everyday," until November 16 when she was told to stop helping Plaintiff (and in response emailed Ms. Boyd).  Thus, Plaintiff was afforded some measure of assistance on a regular basis, though not enough apparently to stay caught up, and Plaintiff claims she was specifically denied assistance beginning in late September or October 2010.

---

[18]Plaintiff mentions in passing (Doc. 39 at 16) that there were "witnessed" complaints about Ms. Rodriguez, but she fails to cite to any evidence to contradict Ms. Boyd's statement that she was unaware of any complaints.  Plaintiff cites to Mr. Sanchez's deposition discussing an argument a patients had with Ms. Rodriguez, but there is no evidence Ms. Boyd was aware of the argument. Doc. 39-3 at 91 (Sanchez Dep. at 84).

*b. Decision maker evidence.* NEFHS further argues that it is entitled to summary judgment because, in cases like this one, where the hirer and firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer. NEFHS also argues that it is entitled to summary judgment because there can be no inference of discrimination since Ms. Boyd (who is white) hired Plaintiff and remained her supervisor throughout Plaintiff's short career at NEFHS until Ms. Boyd terminated her less than fourteen months later. Doc. 36 at 16 (citing *Leath v. Hansell*, 2008 WL 151869, *5 n.9 (M.D. Fla. January, 14, 2008) (when the decision-maker is of the same race as the adversely affected party, the plaintiff should present evidence that the decision-maker "held members of his own race to a higher standard of conduct than members of another race") (citing *United States v. Crosby*, 59 F.3d 1133, 1135 n. 4 (11th Cir. 1995)). In response, Plaintiff argues that the race of the decision-maker may be relevant, but is not controlling. Doc. 39 at 17 (citing *Billingsley v. Jefferson County*, 953 F.2d 1351, 1353 (11th Cir. 1992) and *Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 78 (1998)). In this case, Plaintiff was hired by Ms. Boyd, knowing she was white, and also terminated by Ms. Boyd a short time – fourteen months–later, and thus there can be no inference of discrimination. *Proud v. Stone*, 945 F. 2d 796 (4th Cir. 1991) (granting summary judgment to employer in age discrimination case where same individual hired plaintiff and fired him six months later "with full knowledge of his age")). Plaintiff also has not presented any evidence that Ms. Boyd held her to a higher standard than members of another race.

*c. Plaintiff's own statements.* NEFHS also argues that, by Plaintiff unequivocally stating at the DOAH hearing, "I believe 100 percent of the reason I was fired is because of me calling the WVHA," Plaintiff has waived any claim that she was terminated because of her race." Doc. 36 at 17. Plaintiff does not dispute she made the prior statement at the DOAH hearing, but she argues she also

meant that she had called WVHA because of "the way [she] was being treated and other issues going on at the DeLand office." Doc. 39 ¶ 14. Reading Plaintiff's comment in the light most favorable to her at this summary judgment stage, her statement could include the substance of her call, including what she believed to be was discriminatory misconduct, and is not a basis for summary judgment for NEFHS.

### 2. Legitimate Reasons for Termination

Even if Plaintiff had presented a prima facie case of race-based disparate treatment with regard to her termination, NEFHS argues that Plaintiff would not be able to show that NEFHS's legitimate, non-discriminatory reasons for her termination – Plaintiff's failure to timely complete her referrals, rudeness to patients and co-workers, and insubordination in calling the WVHA – were pretextual. NEFHS argues that Plaintiff has admitted to all of the conduct that serves as the legitimate non-discriminatory reasons for her termination–that she was behind on referrals, that she had "personality conflicts" with co-workers[19] and had been the basis of patient complaints, and that she called the WVHA instead of speaking with the appropriate supervisors–such that NEFHS's reasons cannot be pretextual.

NEFHS argues that Plaintiff has offered no evidence to rebut its assertion that it received patient complaints about Plaintiff, and in fact, she testified at her deposition that during her employment with NEFHS she was aware that patients had complained about her. NEFHS argues that she cannot now attempt to negate her deposition testimony through a subsequently-produced declaration or affidavit. Doc. 41 at 4 (citing *Roddy v. City of Villa Rica*, 536 Fed. Appx. 995 (11th Cir. 2013) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact for summary judgment, that party cannot thereafter

---

[19]Plaintiff admitted to "personality conflicts" with Ms. Triplett and Ms. Marquez. Doc. 39 at 5 ¶ 6.

create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.")). NEFHS also argues that, while Plaintiff claims it lacks documentation supporting its reasons, Plaintiff admittedly received numerous memoranda and emails addressing Plaintiff's poor performance, and Plaintiff concedes NEFHS has documented complaints about Plaintiff which were in her file post-July 2010. Ms. Boyd repeatedly contacted Plaintiff about getting the referrals caught up "every two to three weeks" and, in fact, would personally help her with referrals when she came to the DeLand office. Ms. Boyd's comments were not based on Plaintiff's race, but on concern for keeping her work current, and delivering patients timely medical care.

NEFHS is entitled to summary judgment unless Plaintiff presents evidence creating a genuine issue of material fact regarding whether NEFHS's asserted reasons are a mere pretext for race discrimination. *See, e.g., Chapman*, 229 F.3d at 1024–25 ("If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim.").

In determining whether an issue has been raised as to pretext, this Court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (citation and internal quotation omitted). This determination involves an "evaluat[ion of] whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.' " *Id.* (quoting *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir.1996)). "The inquiry into pretext centers

upon the employer's beliefs, and not the employee's own perceptions of [her] performance." *Holifield,*

*v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997). The Eleventh Circuit has stated that the court is "not

in the business of adjudging whether employment decisions are prudent or fair." *Damon v. Fleming*

*Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999).

Plaintiff's argument that the complaints from patients or physicians were not written in her

personnel file before July 2010, with her implication that they therefore carry less weight, is without

merit. Plaintiff has not contradicted Ms. Boyd's sworn account, or contemporaneous notes, nor the

declarations from several patients that they had complained about Plaintiff to NEFHS. Moreover,

Plaintiff admits she was aware that patients had complained about her. Plaintiff has also not offered

any evidence contradicting Ms. Boyd's declaration that she had complaints about Plaintiff from

coworkers or medical professionals who did not want to work with Plaintiff; Plaintiff admits this, but

characterizes these incidents as "personality conflicts."

Applying these standards, Plaintiff has failed to present evidence creating a genuine issue of

material fact regarding pretext. *See Tidwell v. Carter Prods.*, 135 F.3d 1422, 1427 (11th Cir. 1998)

(finding no issue raised as to pretext where evidence presented did "not provide the needed 'more than

a mere scintilla of evidence' to survive a motion for judgment as a matter of law" and did "not present

a substantial conflict in the evidence as to [the employer's] purported reason for terminating [the

plaintiff] . . . as to support a jury question"). Accordingly, NEFHS is entitled to summary judgment

on Plaintiff's disparate treatment claims.

### 3. Racial "harassment"/hostile work environment by management

Plaintiff alleges that she was discriminated against when she was "harassed by management,"

who created a hostile work environment – of" humiliation, intimidation, embarrassment, threats, and

degradation, on a daily basis for several weeks" – by sending her "threatening" emails while denying

her assistance with referrals[20], and by ignoring her requests for assistance with referrals.  Doc. 39 at 19, 23.  She argues that Ms. Ortiz[21] and Ms. Boyd's actions were substantial enough to alter her employment by denying Plaintiff assistance from Mr. Sanchez, who Plaintiff believed was hired to assist her on referrals, and from other coworkers when Ms. Boyd instructed "assistance to stop a few weeks before Plaintiff was terminated."  Doc. 39 at 18-19, 23.  Plaintiff also argues that Ms. Boyd condoned the instruction of Ms. Ortiz for coworkers not to assist Plaintiff, yet harassed her by saying to "get it done or else," while she refused to investigate the complaints by Plaintiff of no assistance. Plaintiff also alleges that Ms. Graham harassed her by not investigating her complaints against Ms. Boyd[22].

NEFHS contends that Plaintiff failed to produce any evidence that Ms. Boyd's emails directing Plaintiff to do her job were based on Plaintiff's race and, thus, the emails are not actionable harassment under Title VII. Doc. 36 at 18 (citing *Baldwin*,  480 F.3d at 1301-02. ("[Title VII] does not prohibit harassment alone, however severe and pervasive. Instead, Title VII prohibits discrimination, including harassment that discriminates based on a protected category")).

To establish a hostile environment claim under Title VII, a plaintiff must show (1) that she was a member of a protected class; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on a protected characteristic of the employee, such as race; (4) that the

---

[20]Plaintiff's allegations regarding the denial of assistance with referrals is discussed above in the section on disparate treatment..

[21]Plaintiff contends that Ms. Ortiz was her supervisor because she instructed Plaintiff and coworkers whether to assist Plaintiff, when to go to lunch, what other duties Plaintiff was to do (e.g., assist with pulling next day charts, coverage in other areas, lunch breaks) on a daily basis and Plaintiff was told by Ms. Boyd, in her absence, to answer to Ms. Ortiz. However, Plaintiff also concedes that Ms. Boyd– not Ms. Ortiz–was the individual who directed her coworkers not to assist her with referrals starting in September 2010.  She also contends that Ms. Boyd "allowed, instructed and authorized it."  Doc. 39 at 24.

[22]To the extent Plaintiff claims that Ms. Wilkes should have consulted with HR-Ms. Graham "to make sure that there was sufficient documentation in Plaintiff's personnel record to determine the termination was for the right reason," because failure to do so was a failure to "discharge the duty of reasonable care," on its face this is not an allegation of hostile racial environment.  Doc. 39 at 19.  Moreover, no such claim was alleged in the EEOC charge.

harassment was sufficiently severe or pervasive to alter the terms or conditions of her employment and create a discriminatorily abusive working environment; and (5) a basis for employer liability. *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 582 (11th Cir. 2000) (sexual harassment case), *abrogation on other grounds recognized by Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008); *Martinez v. Workforce Cent. Fla.*, No. 6:06-cv-1062-28KRS, 2008 WL 1806119 (M.D. Fla. April 21, 2008) (applying the standards in a race-discrimination case). Plaintiff arguably may satisfy the first and third elements because she alleges she was subjected to "harassment" based on being white when the other individuals around her who refused to assist her were Hispanic[23]. However, Plaintiff's claim fails on the second and fourth elements in that the conduct she alleges did not constitute "harassment," nor was it sufficiently severe or pervasive.

"Establishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). "Harassment is subjectively severe and pervasive if the complaining employee perceives the harassment as severe and pervasive, and harassment is objectively severe and pervasive if a reasonable person in the plaintiff's position would adjudge the harassment severe and pervasive." *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000).

The determination of whether an environment is objectively hostile "can be determined only by looking at all the circumstances." *Harris*, 510 U.S. at 23. The circumstances to consider "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening

---

[23]It is debatable whether Plaintiff, who is white, was a member of a protected class, for purposes of a harassment claim. *See Hunt v. Central Consol. School Dist.*, 951 F.Supp.2d 1136 (noting that historically whites are not a protected group but in certain cases can state a discrimination claim on the same terms as racial discrimination against nonwhites). The Court need not decide the issue, given the disposition on the other elements of her claim.

or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* It is well-settled that "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). "[C]onduct must be extreme to amount to a change in the terms and conditions of employment." *Id.*

Even crediting Plaintiff's assertions that she perceived Ms. Boyd's emails to be "harassing" and severe and pervasive, from an objective standpoint, the emails were not based on Plaintiff's race but were addressed to her productivity on accomplishing the quantity of referrals required. Moreover, they did not rise to the level of severity necessary for an actionable hostile work environment claim.

Out of all of the conduct Plaintiff asserts that could possibly be construed as "harassment," (as opposed to disparate treatment discussed above) only the emails sent from Ms. Boyd which Plaintiff has characterized as "threatening" to "get it done or else" would even arguably fall into that category. Ms. Boyd sent Plaintiff emails directing her to get the referrals caught up and Plaintiff alleges she suffered being "humiliated, intimidated, embarrassed, threatened and degraded on a daily basis for several weeks" but only specifically identifies Ms. Boyd's November 16, 2010 email as "harassing." *See* Doc. 39 at 23; Doc. 36-3 (P. Dep. at 208-09). The email stated:

> I am getting a lot of complaints about the referrals at the DeLand center. I do not mean to sound so ugly, but we have to do something or else we have to make some changes. . . . I also had two complaints about you being rude with two different patients. What gives??? . . . I can't continue to cover for you, nor can I afford to lose my job for you. . . So I'm asking in a nice way; please do your job and get those referrals off your desk. . . Lisa Bennis is NOT your boss; I am and this is the way NEFHS will operate or else.

Doc. 36-3 (P. Dep. at 208-09); Doc. 36-3 at 102 (Ex. 14).  While the email conveys Ms. Boyd's evident frustration with Plaintiff, there is nothing contained in it that could be construed as race-based discrimination or racial harassment. *Cf. Lusega v. Albrecht & Albrecht, Inc.*, No. 1:06-CV-0809-JEC, 2007 WL 2226056, at *4 (N.D. Ga. July 31, 2007) (noting that "[c]ases involving more serious allegations than plaintiff's are routinely the subject of summary judgment orders in this Circuit," and collecting cases).

NEFHS argues that Ms. Boyd's use of the word "slacker" (on one occasion) has no racial connotation and, as an isolated comment, it was not sufficient to establish a hostile work environment. The Court finds that "slacker" is not a racially-biased term and is not direct evidence of race discrimination. *See, e.g., McCullough v. Xerox Corp.*, 942 F.Supp.2d 380 (W.D. N.Y. 2013) (granting summary judgment on African American plaintiff's hostile environment claim holding that the terms "slacker" and "not working at full capacity" fell woefully short of what is required to state a hostile work environment claim and were mere work-related criticisms that could not reasonably have deemed to have given rise to an objectively hostile work environment).  Moreover, the entirety of the hand-written message from Ms. Boyd had a teasing tone and said, "Bye Slacker. You know I love you. Have a good evening. CB [Cheri Boyd]" Doc. 39-2 at 60 (Ex. 21).  In this case, the message was teasing directed to an individual chided for being behind in her work at the time Ms. Boyd came in to help Plaintiff in August 2010.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (noting Title VII is not a "general civility code." . . . Title VII goes beyond "the ordinary tribulations of the work place, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing").  NEFHS is entitled to summary judgment on Plaintiff's harassment claim.

**4. Retaliatory Termination**

Plaintiff argues she was terminated in retaliation for two different complaints about "discriminatory misconduct."   First, she argues that her termination on November 19 followed the November 16 email to Ms. Boyd from Ms. Carbajal[24], questioning what Plaintiff describes as "discriminatory misconduct."  Doc. 39 at 26.  Second, Plaintiff argues that her termination followed her own direct complaints to Ms. McNeil, the WVHA board member, that she was being treated less favorably than Hispanic employees, and Ms. McNeil informing Ms. Boyd[25] that Plaintiff had contacted her to complain.  Doc. 39 at 28.   She also alleges that the "heightened scrutiny" she came under – with Ms. Boyd ordering reports of her productivity on the days leading up to her termination – was a retaliatory action.

The anti-retaliation provision of Title VII provides in pertinent part that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). The retaliation claim is, like the race discrimination claim, appropriately analyzed under the *McDonnell Douglas* framework discussed above.

To make a prima facie showing of retaliation under Title VII, a plaintiff must show: (1) that she engaged in statutorily protected activity; (2) that she suffered a materially adverse action; and (3) a causal connection between the two events.  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006); *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913,

---

[24]Doc. 36-9 Ex. 10 (Carbajal email); Doc. 39-3, Ex. 48 (same).

[25]Plaintiff alleges that Ms. Boyd said to her: "I know you called the WVHA, they called and told me you called, Darlene.  Didn't you know they'd call me?" Doc. 39-2, P. Dec. ¶ 52. It is undisputed that "the WVHA told Ms. Boyd that Plaintiff had called and this was one of the grounds for Plaintiff's termination.

919 (11th Cir. 1993).  It is not disputed that Plaintiff was terminated; thus, the second prong of the prima facie case is satisfied.  However, NEFHS does challenge Plaintiff's establishment of the first and third elements, and its summary judgment arguments on these points are well-taken.

NEFHS contends that Ms. Carbajal's email merely complained of "harassment" or "unfair treatment," and such complaints about "unfair treatment" absent discrimination based on a protected characteristic are insufficient to constitute protected activity under Title VII.  Doc. 36 at 20 (citing cases).  NEFHS contends, with respect to Plaintiff's discussions with Ms. Boyd on November 16, and with Kelli Graham on November 18, such communications do not constitute protected activity because merely complaining of "harassment" or "unfair treatment" absent discrimination based on a protected characteristic is insufficient to constitute protected activity under Title VII.  When Ms. Graham specifically asked Plaintiff "how [are you being bullied, threatened and harassed by Ms. Boyd]," Plaintiff responded, "Didn't you see the emails I sent you I don't want to be fired over the referrals" and Plaintiff's statement to Ms. Boyd was simply that she was not receiving assistance. NEFHS argues that none of these communications contain complaints of unlawful activity based on a protected characteristic.

Note Ms. Carbajal is not herself claiming retaliation based on race discrimination and she was not sending the email as a proxy for Plaintiff, who was quite capable, and did in fact, complain directly about the "unfairness" and the need she had for assistance on referrals.  In addition, Ms. Carbajal's email challenges the instruction from Ms. Boyd to no longer help Plaintiff with referrals as "not being part of a team," and neither her email nor any of Plaintiff's make any reference whatsoever to discrimination on the basis of Plaintiff's race.  *Coutu v. Martin County*, 47 F.3d 1068, 1075 (11th Cir. 1995) (holding that employee's charge he was treated unfairly, without some allegation treatment was based on race, "did not constitute statutorily protected activity" because

"[u]nfair treatment" alone "is not an unlawful employment practice under Title VII"); *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 262 (1st Cir. 1999) (no protected activity where plaintiff complained of supervisor's treatment but never stated a belief that it violated Title VII or any other law).

NEFHS further argues that Plaintiff failed to satisfy her burden of proving retaliation under Title VII because, at most, NEFHS only had knowledge that Plaintiff called the WVHA to complain about "patient care issues," and did not know that Plaintiff complained about unlawful activity under Title VII; thus, Plaintiff's retaliation claim fails because, at a minimum, Plaintiff must establish that NEFHS was actually aware of the protected expression at the time it took the adverse employment action. NEFHS argues that temporal proximity alone is not sufficient when, as here, the unrebutted evidence shows that the decisionmaker Ms. Boyd did not have knowledge of Plaintiff's protected conduct.

In this case, Ms. McNeil testified that she did not reveal the substance of the conversation with Plaintiff to anyone at NEFHS until after Plaintiff had been terminated. Thus, even if Plaintiff had alleged to Ms. McNeil that she was in the process of being terminated because of race discrimination, the content of the phone call and Plaintiff's putative complaint of discrimination were not communicated to Ms. Boyd, only that Plaintiff had contacted a board member at the WVHA. When the decisionmaker is not aware that the plaintiff has engaged in protected activity, then Plaintiff cannot state a prima facie case. *See, e.g, Dent v. Georgia Power Company*, 522 Fed. Appx. 560, 563 (11th Cir. 2013) (holding plaintiff could not state a prima facie case where neither of the decisionmakers knew that he had filed an EEOC charge prior to terminating him).

As to the third element of Plaintiff's prima facie case, the record evidence shows that the decisionmaker Ms. Boyd had begun the process to terminate Plaintiff during the week preceding

-35-

Friday, November 19 and Plaintiff had begun to remove her personal belonging, *before* Plaintiff made the phone call to Ms. McNeil on the morning of November 19.  As the Eleventh Circuit has explained, "anti-retaliation provisions do not allow employees who are already on thin ice to insulate themselves against termination or discipline by preemptively making a discrimination complaint." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1270 (11th Cir. 2010).  The record establishes that, at a minimum, Defendant "had legitimate non-[retaliatory] reasons to fire [Plaintiff] before she complained, and it remained free to act on those reasons afterward."  *Id*.; *see Whitt v. SunTrust Bank,* 2012 WL 6106405 (M.D. Fla. Dec. 10, 2010) (holding that employer had a legitimate, non-discriminatory reason to terminate plaintiff after it identified issues in an audit and before it had notice of her EEOC charge).  In this case (as discussed at length above), the record establishes that NEFHS had legitimate, non-retaliatory reasons to terminate Plaintiff's employment for failure to timely complete her referrals and rudeness to patients and co-workers, even before she contacted Ms. McNeil, thus, NEFHS remained free to act on those reasons afterward.  NEFHS is entitled to summary judgment on Plaintiff's retaliation claim.

## CONCLUSION

It is respectfully **RECOMMENDED** that NEFHS's Motion for Summary Judgment be **GRANTED** on the basis that Plaintiff's claims were untimely filed.  Even assuming that Plaintiff's claims were not untimely filed, the Court also respectfully **RECOMMENDS** that NEFHS's Motion for Summary Judgment be **GRANTED** on the merits of Plaintiff's claims for disparate treatment, hostile environment and retaliation based on race discrimination for the reasons stated above.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on July 1, 2014.

*David A. Baker*
_____
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy